

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00056-CV

| | |
|---|---|
| ORCA ASSETS, G.P., L.L.C.; ORCA/ICI DEVELOPMENT; ORCA PETROLEUM, LTD.; AND ALLEN BERRY | APPELLANTS |
| | |
| V. | |
| | |
| LOUIS DORFMAN; K.I. HOLDINGS, LTD.; SAM MYERS; J.M.D. RESOURCES, INC.; BILLY COGDELL BOWDEN; BARBARA STANDFIELD; STACEY DORFMAN-KIVOWITZ; JULIA DORFMAN; MARK DORFMAN; DAVID PHILLIP COOK; CHERYL KING COOK; SAM Y. DORFMAN, JR.; FRANK MORAVITS, INDIVIDUALLY AND AS TRUSTEE OF THE MORAVITS CHILDREN TRUST NO. 1 AND MORAVITS CHILDREN TRUST NO. 2; SHELBY MORAVITS; AND JERRY KORTZ | APPELLEES |

----------

**AND**

NO. 02-14-00057-CV

JPMORGAN CHASE BANK, N.A.,                                    APPELLANT
AS TRUSTEE OF THE RED CREST
TRUST

V.

LOUIS DORFMAN; K.I. HOLDINGS,                                 APPELLEES
LTD.; SAM MYERS; J.M.D.
RESOURCES, INC.; BILLY
COGDELL BOWDEN; BARBARA
STANDFIELD; STACEY DORFMAN-
KIVOWITZ; JULIA DORFMAN;
MARK DORFMAN; DAVID PHILLIP
COOK; CHERYL KING COOK; SAM
Y. DORFMAN, JR.; FRANK
MORAVITS, INDIVIDUALLY AND
AS TRUSTEE OF THE MORAVITS
CHILDREN TRUST NO. 1 AND
MORAVITS CHILDREN TRUST
NO. 2; SHELBY MORAVITS; AND
JERRY KORTZ

FROM THE 342ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 342-259139-12

----------

# OPINION

----------

In these permissive interlocutory appeals[1] that hinge on the effects of a

1929 deed and a 1944 judgment by a district court in Karnes County, appellants

Orca Assets, G.P., L.L.C.; Orca/ICI Development; Orca Petroleum, Ltd.; and

---

[1]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(d), (f) (West 2015); Tex. R. App. P. 28.3.

2

Allen Berry (collectively Orca), along with appellant JPMorgan Chase Bank, N.A., as Trustee of the Red Crest Trust (JPMorgan), appeal the trial court's February 5, 2014 "Rule 166 Order on Legal Matters Decided by the Court." We affirm.

## Background Facts

These appeals concern ownership and development rights to a 200.1-acre tract in Karnes County. In 1901, William Mayfield conveyed the tract to Mary Moravitz.[2] In 1929, along with her husband J.W., Mary purportedly conveyed an undivided fifteen-sixteenths interest in all minerals within that tract to H.J. McMullen.[3] The same year, H.J. conveyed the executive right to the tract,[4] along with the rights to receive delay rentals and bonus payments, to McMullen Oil & Royalty Co., Inc. (McMullen Oil). H.J. retained for himself the right to receive royalty payments from production on the tract.

H.J. died in 1934; his wife, Susie, survived him. Through H.J.'s will, any of his interest in the tract passed to Susie, the will's executrix. Susie later remarried and took the last name of Langille. She acted as McMullen Oil's president before

---

[2]The 1901 deed spells the name "Moravietz." Other references to the family's name in the record use a "Moravitz" or "Moravits" spelling.

[3]The deed stated that the grantors retained a one-sixteenth royalty interest in the minerals.

[4]This deed stated that H.J. conveyed to McMullen Oil the "full right, power[,] and authority to execute such oil, gas[,] and mineral leases on the property . . . without the joinder of H.J. . . . or any of his heirs . . . on such terms and provisions as [McMullen Oil] may deem best."

3

dying in 1938. Her will created a trust (the Langille Trust) that designated the Fort Worth National Bank (FWNB) as trustee and named her surviving children as beneficiaries.[5] Susie's will made some specific bequests to her husband and others but placed the general residue of her property, including any interest in the 200.1-acre tract that had been reserved by H.J., into the trust.

In 1943, Mary and her sons, who had leased the property for the development of minerals, filed a lawsuit in Karnes County against McMullen Oil to cancel Mary's purported 1929 deed to H.J. They claimed that the deed had been forged and had been procured by fraud. In the last paragraph of the petition, the Moravitzes prayed that "the instrument . . . conveying an undivided fifteen-sixteenths . . . mineral interest in and under the 200.1 acres . . . be cancelled . . . and held for naught."

McMullen Oil filed a document disclaiming its interest in the tract. The disclaimer stated,

> This defendant denies the allegations in plaintiffs' petition, but states in open court that it asserts no right, title, interest[,] or right of possession in and to the premises described in plaintiffs' petition aforesaid, *and says as far as it is concerned the plaintiffs herein have all right, title, interest[,] and right of possession thereto.* [Emphasis added.]

The Karnes County district court signed a judgment in 1944 that "cancelled and held for naught" the 1929 deed. The court, while reciting that McMullen Oil

---

[5]FWNB, which was the independent executor of Susie's will, morphed through mergers into several different entities after 1938, eventually becoming part of JPMorgan Chase Bank, National Association.

4

had filed a disclaimer, also declared that "title to the . . . oil, gas[,] and other minerals" belonged to Mary and her sons.  The judgment stated that the court had considered "evidence and argument of counsel," and it recited that the Moravitzes had signed the 1929 deed.

In 1961, FWNB conveyed (while reserving a royalty) any mineral interests owned by it (as trustee) or the McMullens (before their deaths) to McMullen Oil. In 1966, McMullen Oil dissolved.  As part of the dissolution, McMullen Oil conveyed to FWNB, as trustee under Susie's will, all of McMullen Oil's rights to any mineral interests that it owned.  The 1966 document did not particularly describe (by metes and bounds, for example) the 200.1 acres or any other property that McMullen Oil may have had rights to at that time.

The Langille Trust terminated in 1984 upon the death of Susie's last-remaining child, and under the terms of Susie's will, the property in the trust was distributed to her grandchildren.  In 1985, the grandchildren created the Red Crest Trust and transferred any oil, gas, and mineral interests that they owned into it.  In 1991, the 1944 judgment was first recorded in Karnes County's deed records.

JPMorgan eventually became the trustee of the Red Crest Trust.  In 2010, JPMorgan executed a lease of minerals underneath the 200.1 acres to Orca. Near the same time, other parties, including the Moravitz family, also leased the

5

right to develop minerals on the property.[6] The parties' existing leases and claims to the property are competing and irreconcilable.

Litigation ensued. Through their own pleadings and in response to appellants' pleadings, the appellees listed above[7] brought causes of action in which they claimed ownership or development rights to the 200.1 acres through the effect of the 1944 judgment that cancelled the 1929 deed, along with a series of transfers following the 1944 judgment. Appellees also contended that appellants had wrongfully clouded and slandered appellees' title. Appellants claimed the rights by pleading that the 1944 judgment is void and unenforceable or that, if generally enforceable, the judgment still cannot extinguish appellants' rights to the property.

The parties sought summary judgment concerning their claims to the property. JPMorgan moved for summary judgment on traditional and no-evidence grounds; it contended, in part, that the 1944 judgment that purported to cancel the 1929 deed was void and that JPMorgan, which allegedly did not have actual or constructive notice of the judgment until 1991, qualified as a bona fide purchaser for value even if the judgment was not void. Among other arguments, Orca likewise contended that the 1944 judgment was void because necessary

---

[6]The Moravitzes also conveyed an undivided 50% interest in the property's minerals to Dorfman Production Company.

[7]Because appellees' interests in this litigation are aligned, we will generally refer to them (and to the arguments they have raised) collectively although they have briefed the appeals separately.

parties were not joined in that lawsuit, that the 1929 conveyance constituted a valid link in its chain of title regardless of whether the 1944 judgment was generally valid; that upon H.J.'s death in 1934, all of McMullen Oil's rights to the property passed to his estate (and thus, to Susie); and that, therefore, all rights relating to the property, including executive rights, passed from Susie to the Langille Trust and eventually to the Red Crest Trust.

Appellees contended, in part, that appellants' arguments about title depended upon the judicially-cancelled 1929 deed and that after the entry of the 1944 judgment, which bound appellants (who were allegedly all in privity with McMullen Oil), no purchaser could have relied on the 1929 deed to become a bona fide purchaser. Appellees also argued that appellants' collateral attacks on the 1944 judgment impermissibly hinged on extrinsic evidence and on reliance upon overruled, inapplicable legal principles. Finally, appellees contended that they had established an unbroken chain of title dating back to Mayfield's conveyance to Mary.

After receiving the parties' extensive briefing and conducting two hearings for argument, the trial court entered a "Rule 166[8] Order on Legal Matters Decided by the Court." The trial court made three conclusions of law:

> 1. The judgment dated April 6, 1944, of the 81st District Court of Karnes County, Texas, in Cause No. 4602, *Mary Moravitz et. al. v.*

---

[8]*See* Tex. R. Civ. P. 166 (authorizing a trial court, for the purpose of "assist[ing] in the disposition of [a] case," to hold a pretrial conference, consider pending motions, and enter an "order that recites the action taken").

7

*McMullen Oil Royalty Company Inc., et. al.*, and recorded in Volume 623 at Page 361 of the Official Records of Karnes County (the "1944 Judgment"), is valid and enforceable against all parties in this cause;

2. The mineral deed dated September 11, 1929, from J.W. Moravits and Mary Moravits, as grantors, to H.J. McMullen, as grantee, and recorded in Volume 86 at Page 415 of the deed records of Karnes County (the "1929 Deed"), is void *ab initio*; and

3. Neither the Defendants, Orca Assets G.P., L.L.C., JPMorgan Chase Bank, N.A., individually and as Trustee of the Red Crest Trust, and Phillip Mettham, nor their predecessors and successors in title to the 200.1 acres of property described in the 1944 Judgment (the "Property") can rely upon the 1929 Deed to establish the defense of a *bona fide* purchaser for value without notice of a conflicting claim of ownership to the Property.

The trial court also stayed further proceedings pending resolution of this appeal.

### The Validity of the 1944 Judgment

In separate briefs, appellants argue that the trial court's rule 166 order should be reversed because, among other reasons, the 1944 judgment is void and unenforceable. They contend that the Karnes County district court did not have jurisdiction to enter the 1944 judgment because the Moravitzes failed to join all necessary parties in their suit to cancel the 1929 deed. We disagree.

In an order issued under rule 166, a trial court may decide legal issues but may not decide contested factual issues. *See Walden v. Affiliated Computer Servs., Inc.*, 97 S.W.3d 303, 322 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g). We review a trial court's application of the law to undisputed facts de novo. *See In re R.J.H.*, 79 S.W.3d 1, 6 (Tex. 2002); *Pinnacle Premier Props., Inc. v. Breton*, 447 S.W.3d 558, 562 (Tex. App.—

Houston [14th Dist.] 2014, no pet.) (op. on reh'g) ("We review questions of law without deference to a lower court's conclusion.").

Appellants' challenge to the validity and enforceability of the 1944 judgment in this litigation is a collateral attack. *See Browning v. Prostok*, 165 S.W.3d 336, 346 (Tex. 2005); *Glunz v. Hernandez*, 908 S.W.2d 253, 255 & n.3 (Tex. App.—San Antonio 1995, writ denied); *see also PNS Stores, Inc. v. Rivera*, 379 S.W.3d 267, 272 (Tex. 2012) ("A collateral attack seeks to avoid the binding effect of a judgment in order to obtain specific relief that the judgment currently impedes."). Only a void judgment may be collaterally attacked. *Browning*, 165 S.W.3d at 346. A judgment is void when the "court rendering judgment had no jurisdiction of the parties or property, no jurisdiction of the subject matter, no jurisdiction to enter the particular judgment, or no capacity to act." *PNS Stores, Inc.*, 379 S.W.3d at 272 (quoting *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 863 (Tex. 2010)).

Because courts prefer to give finality to judgments, collateral attacks on judgments are generally disallowed. *In re Blankenship*, 392 S.W.3d 249, 254 (Tex. App.—San Antonio 2012, no pet.) (citing *Browning*, 165 S.W.3d at 345). A collateral attack, which attempts to bypass the appellate process in challenging the integrity of a judgment, runs counter to the policy of finality. *Id.* Thus, when attacked collaterally, a judgment is "presumed valid." *PNS Stores, Inc.*, 379 S.W.3d at 273. But the presumption of validity disappears when the record establishes a jurisdictional defect. *Id.* The record affirmatively demonstrates a

9

jurisdictional defect sufficient to void a judgment when it establishes that the trial court lacked subject matter jurisdiction over the suit. *Id.* A court's review in a collateral attack is "limited to whether the record affirmatively and conclusively negates the existence of jurisdiction, not whether the trial court otherwise erred in reaching its judgment." *Blankenship*, 392 S.W.3d at 255.

Appellants argue that the Karnes County district court did not have jurisdiction to enter the 1944 judgment (and that the 1944 judgment is therefore void) because all parties owning an interest under the 1929 deed and later conveyances connected to that deed were necessary parties to that lawsuit,[9] the Langille Trust owned such an interest (at least a reserved royalty interest, as passed down from H.J.'s and Susie's wills), and the Langille Trust was not joined in the suit. Although Orca asserts that appellees "do not dispute that the Langille Trust was never joined as a party," appellees argued in the trial court and contend on appeal that the Langille Trust was made a party to the 1944 judgment through the doctrine of virtual representation.[10] We agree.

---

[9]Appellants rely in part on a 1936 decision in which the supreme court stated that it was "settled . . . that in a suit to cancel a written instrument[,] all persons whose rights . . . [would] be affected by the cancellation [were] necessary parties" and that the absence of such necessary parties was jurisdictional. *Sharpe v. Landowners Oil Ass'n*, 127 Tex. 147, 148, 92 S.W.2d 435, 436 (1936).

[10]Many of the appellees, in their "Second Amended Motion for Partial Summary Judgment" filed in March 2013, argued in part, "The Langille Trust and its interests were so connected in law with McMullen Oil as to have such an identity of interest that the party to the judgment represented the same legal

10

For over a century, Texas courts have recognized that under the doctrine of virtual representation, there are "cases in which certain parties before the court are entitled to be deemed the full representatives of all other persons . . . so far as to bind their interests under the decree, although they are not . . . made . . . parties." *Miller v. Foster*, 76 Tex. 479, 486–87, 13 S.W. 529, 531–32 (1889) (holding that in a suit concerning a will, "the person entitled to the first estate of inheritance," who was a named party to the suit, virtually represented parties who held dependent and contingent remainder interests and were not named parties); *see Looney v. First Nat'l Bank of Floresville*, 322 S.W.2d 53, 56 (Tex. Civ. App.—San Antonio 1959, writ ref'd n.r.e.) (citing *Miller* and concluding that "after-born remaindermen [were] bound . . . under the doctrine of virtual representation" although they were not named parties to the suit); *S. Ornamental Iron Works v. Morrow*, 101 S.W.2d 336, 342 (Tex. Civ. App.—Fort Worth 1937, no writ) (stating that the doctrine of virtual representation "is not in conflict with the well-known rule of law that 'every person is entitled to his day in court,' for indeed he has had his day and his interests were represented by those upon whom his interests depend"); *see also Aerojet-Gen. Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.) (explaining that under federal law, "a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative"), *cert. denied*, 423 U.S. 908 (1975).

right, and was virtually represented in the 1943 Litigation." The remaining appellees made a similar argument in a May 2013 summary judgment brief.

When it applies, the doctrine of virtual representation defeats a contention that a judgment is void for failure to join parties who were allegedly necessary and indispensable. *See Mason v. Mason*, 366 S.W.2d 552, 553–55 (Tex. 1963) (concluding that because virtual representation applied, the "fact that . . . three . . . minor beneficiaries were not made parties . . . [did] not render the judgment void and subject to collateral attack nor [did] it constitute fundamental error").

Although our supreme court first recognized in the contingent-remainder context that a named party may virtually represent interests of an unnamed party, courts thereafter extended the equitable doctrine of virtual representation to other contexts. *See In re Lumbermens Mut. Cas. Co.*, 184 S.W.3d 718, 722 (Tex. 2006) (orig. proceeding) (stating that the doctrine is equitably based); *Young v. City of Corpus Christi*, No. 13-03-00559-CV, 2006 WL 1360842, at *5 (Tex. App.—Corpus Christi May 18, 2006, no pet.) (mem. op.) (reciting relationships where virtual representation has been found, including "estate beneficiaries bound by administrators, presidents and *sole stockholders by their companies*, parent corporations by their subsidiaries, and a trust beneficiary by the trustee" (emphasis added) (quoting *Sw. Airlines Co. v. Tex. Int'l Airlines, Inc.*, 546 F.2d 84, 97 (5th Cir.), *cert. denied*, 434 U.S. 832 (1977))); *see also Allied Van Lines, Inc. v. Cent. Forwarding, Inc.*, 535 S.W.2d 412, 416 (Tex. Civ. App.—Waco 1976, writ ref'd n.r.e.) (holding that virtual representation principles precluded a second suit brought by private parties when the State of Texas was the plaintiff in the first suit in which a trial court construed a document common to both suits); *Bingham*

12

*v. Graham*, 220 S.W. 105, 111–12 (Tex. Civ. App.—Amarillo 1920, no writ) (stating that the doctrine has been applied in cases involving trusts and unincorporated associations and explaining that the "parties [virtually] represented must have a common interest with those before the court").

Today, the virtual representation doctrine applies, and a litigant is therefore deemed to be a party (whether or not it requests to be a party), when the litigant will be bound by the judgment, its privity of interest appears from the record, and there is an identity of interest between the litigant and a named party to the judgment. *See Lumbermens*, 184 S.W.3d at 722 (citing *Motor Vehicle Bd. of Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n, Inc.*, 1 S.W.3d 108, 110 (Tex. 1999)); *BJVSD Bird Family P'ship v. Star Elec., L.L.C.*, 413 S.W.3d 780, 783–86 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (reciting and applying the *Lumbermens* elements); *see also Mason*, 366 S.W.2d at 554 (concluding that because trust beneficiaries' interests were identical to the interests of the trustee, the beneficiaries were virtually represented); *Indus. Generating Co. v. Jenkins*, 410 S.W.2d 658, 661 (Tex. Civ. App.—Austin 1966, no writ) ("It is the identity of interests which is of paramount importance in determining the applicability of the doctrine of virtual representation."); *Meyer v. Wichita Cnty. Water Improvement Dists. Nos. 1 & 2*, 265 S.W.2d 660, 662 (Tex. Civ. App.—Fort Worth 1954, writ ref'd n.r.e.) (stating that virtual representation occurs when the "representative parties actually participating in the suit . . . are either prosecuting or defending rights or interests so substantially identical to those of [an unnamed party as to

13

ensure] his adequate representation therein"); *Peters v. Allen*, 296 S.W. 929, 933 (Tex. Civ. App.—San Antonio 1927, no writ) (holding that an unnamed party was virtually represented when the named party "had the same interest in defending against said suit that [the unnamed party] would have had"). Parties may be in privity in at least three ways: (1) they can control an action even if they are not parties to it; (2) their interests can be represented by a party to the action; or (3) they can be successors in interest, deriving their claims through a party to the prior action. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 653 (Tex. 1996).

The record establishes that in 1938, Seth Barwise's law firm filed a petition to probate Susie's will that created the Langille Trust. Barwise had previously served as a witness to Susie's signature on the will. Barwise also acted as the attorney for FWNB in its capacity as trustee of the Langille Trust.

In 1943, Barwise, acting as president of McMullen Oil, executed a mineral lease of part of the 200.1-acre property "owned by Mary Moravitz." The lease allowed Clarke and Cowden Drilling Corporation (Clarke and Cowden) to drill for oil and gas, and it explicitly recognized H.J.'s (along with his heirs and assigns) rights to receive royalties.[11] The Moravitzes' 1943 lawsuit, filed against both McMullen Oil and Clarke and Cowden, sought to invalidate the 1929 deed and, by extension, the claims of anyone to the 200.1-acre tract at that time other than

---

[11]The Moravitzes had previously executed a lease with Clarke and Cowden concerning the same property. These conflicting leases appear to have motivated the Moravitzes' 1943 suit.

14

the Moravitzes, including McMullen Oil, H.J. (along with his heirs), and Clarke and Cowden.[12]  Thus, the defendants to the 1943 lawsuit—McMullen Oil and Clarke and Cowden—were certainly aware that the result of that suit would affect not only their interests but the reserved royalty interest of H.J. (and his heirs), who had been named in their lease.  Even so, Barwise's law firm, which also represented the Langille Trust, executed on behalf of McMullen Oil the disclaimer that led to the 1944 judgment; the disclaimer expressed McMullen Oil's recognition that the Moravitzes had "*all* right, title, interest[,] and right of possession" to the 200.1-acre tract.[13]  [Emphasis added.]

In 1950, FWNB, in its capacity as trustee for the Langille Trust, executed a document titled "RATIFICATION OF LEASES."  That document establishes that H.J. had previously conveyed real property interests to McMullen Oil while reserving royalties in those interests; that H.J. and Susie had died and had successively conveyed H.J.'s remaining interests in the real property to FWNB in trust; that FWNB, as trustee of the Langille Trust, also owned "all of the capital

---

[12]JPMorgan recognizes that the Moravitzes sued Clark and Cowden because it had leased the 200.1-acre tract from McMullen Oil.

[13]Texas courts have concluded that such a disclaimer is generally irrevocable and binds not only the party entering it but also that party's privies. *See Sanders v. Taylor*, 500 S.W.2d 684, 686 (Tex. Civ. App.—Fort Worth 1973, no writ); *Daugherty v. Templeton*, 50 Tex. Civ. App. 304, 311, 110 S.W. 553, 558 (Dallas 1908, writ ref'd).

stock of McMullen Oil" and had done so since Susie's will was probated;[14] that FWNB, as trustee of the Langille Trust, therefore had authority to ratify leases previously executed by McMullen Oil; and that FWNB, as trustee of the Langille Trust, was ratifying "every oil and gas lease executed by . . . McMullen Oil . . . in connection with the real property covered by" H.J.'s conveyance to McMullen Oil.

As owner of McMullen Oil's stock, according to Susie's will (which created the trust in 1938), the trust had explicit authority, among other prerogatives, to vote on business matters, exchange stock, enter into any agreement with respect to the redemption of any stock, or consent to reorganization of the business or the sale of its property. The trust also had authority, with respect to McMullen Oil (of which stock Susie owned at the time of her death), to "liquidate all or part of [the business], at [the trust's] sole and exclusive discretion." Further evidencing FWNB's management of McMullen Oil, those entities shared a business address.[15]

Under Susie's will, as the trustee of the Langille Trust, FWNB had express authority to "defend all claims and causes of action asserted against the Trust

[14]One of the recitals in the document stated that at "all times material herein all of the capital stock of McMullen Oil & Royalty Company, Inc., except director's qualifying shares, was owned by the said H.J. McMullen, the said Susie McMullen Langille, and now by the [FWNB], Trustee." We note that Orca represented in its abstract of title that the probating of Susie's will established the Langille Trust "with [FWNB] as Trustee of stock in McMullen Oil."

[15]On a 1943 tax return, McMullen Oil listed its address as "c/o Trust Dept., Fort Worth National Bank." Other documents within the record use a similar address for McMullen Oil in years preceding the 1944 judgment.

16

property," which included all of the stock in McMullen Oil. Susie's will also directed FWNB, as trustee, to "continue to operate and conduct [the] businesses in which [she was] engaged at the time of [her] death."

The fused relationship between McMullen Oil and the Langille Trust continued in the years following the 1944 judgment. In 1961, FWNB conveyed (while reserving a royalty) any mineral interests owned by it (as trustee) or the McMullens (before their deaths) to McMullen Oil. In 1966, McMullen Oil dissolved. As part of the dissolution, McMullen Oil conveyed to FWNB, as trustee under Susie's will, all of McMullen Oil's rights to any mineral interests that it owned. The record also establishes that in two 1961 transactions, one person acted as both the vice president of McMullen Oil and the Trust Officer of FWNB in its capacity as the trustee of the Langille Trust.

These uncontroverted facts and the other facts recited above establish that McMullen Oil and the Langille Trust claimed a shared interest in the property in 1943, when the Moravitzes filed their law suit; that the Langille Trust's interests in that suit (to obtain any royalties from production) were dependent on and would have aligned with the interests of McMullen Oil (which had executed a lease on the property to Clarke and Cowden); and that the Langille Trust, by its trustee FWNB, owned and controlled McMullen Oil at that time. Therefore, we conclude and hold that the virtual representation doctrine applies to deem the Langille Trust a party to the 1943 suit because the Langille Trust, as the sole stockholder of McMullen Oil, was bound by the judgment against McMullen Oil; the privity

17

between the Langille Trust and McMullen Oil (based on the Langille Trust's ownership, right of control, and control of McMullen Oil and the Langille Trust's interest in the property that stood or fell alongside the validity of McMullen Oil's interest under the allegations in the Moravitzes' suit) appears from the record; and the record establishes an identity of interest between the Langille Trust and McMullen Oil. *See Lumbermens*, 184 S.W.3d at 722; *Amstadt*, 919 S.W.2d at 653; *Paine v. Sealy*, 956 S.W.2d 803, 807 (Tex. App.—Houston [14th Dist.] 1997, no pet.) ("Generally, a judgment against a corporation is *res judicata* in a subsequent suit against a stockholder."); *W. Inn Corp. v. Heyl*, 452 S.W.2d 752, 760 (Tex. Civ. App.—Fort Worth 1970, writ ref'd n.r.e.) ("The doctrine is established that stockholders of a corporation are in privity with the corporation as to all corporate matters and, in the absence of fraud, are bound by a decree against the corporation."); *see also Donzis v. Immudyne, Inc.*, No. 04-00-00685-CV, 2001 WL 913977, at *2 (Tex. App.—San Antonio Aug. 15, 2001, no pet.) (not designated for publication) (citing *Paine* and *Heyl* and stating that "[s]hareholders of a corporation are in privity with the corporation as to all corporate matters and are bound by a decree against the corporation, and vice versa"); *Mobil Exploration & Producing U.S. Inc. v. McDonald*, 810 S.W.2d 887, 890 (Tex. App.—Beaumont 1991, writ denied) ("A privy is one so connected in law with a party to the judgment as to have such an identity of interests that the party to the judgment represented the same legal right.").

18

In reaching this holding, we reject Orca's argument that at the time of the 1943 lawsuit, McMullen Oil had no interest in the property.[16] For this proposition, Orca relies on *Pan Am. Petroleum Corp. v. Cain*, 355 S.W.2d 506 (Tex. 1962), *overruled by Day & Co. v. Texland Petroleum, Inc.*, 786 S.W.2d 667 (Tex. 1990) (op. on reh'g). In *Cain*, a grantor had conveyed an undivided one-fourth interest in the minerals of a tract but had reserved the right to lease the land without the joinder of the grantee. 355 S.W.2d at 507. The grantor then died, and his heirs executed four oil and gas leases on the property. *Id.* A party claiming interest in the land through the grantee argued that the leases were ineffective because the grantor's power to lease had terminated upon his death. *See id.* The supreme court agreed, concluding that a reserved executive right that is not a "power coupled with an interest" and that does not have "words of inheritance" in the reservation[17] terminates with "the death of the original holder unless there is something to indicate that the parties intended that the power should survive and be exercised by others." *Id.* at 509–10.

Attempting to apply *Cain*, Orca argues that when H.J. died in 1934, the rights he had conveyed to McMullen Oil in 1929—including the executive right, the right to receive delay rentals, and the right to receive bonus payments—

_____

[16]JPMorgan does not present this argument on appeal.

[17]We note that the 1929 conveyance from H.J. to McMullen Oil stated that McMullen Oil had the right to execute oil and gas leases on the property "without the joinder of H.J. McMullen *or any of his heirs, representatives[,] or assigns.*" [Emphasis added.]

19

reverted back to his estate (and eventually passed to the Langille Trust), and McMullen Oil no longer had any interest in the property. For two reasons, we disagree.

First, the holding in *Cain* is inapposite to the facts here, in which McMullen Oil (the grantee), not H.J. (the grantor), held the executive right upon H.J.'s death and continued in existence for three decades thereafter. *Cf. id.* at 507 ("The controlling question presented by this appeal is whether the power to lease as reserved in a certain deed conveying an undivided mineral interest may be *exercised by the heirs of the grantor after the latter's death*." (emphasis added)). Orca has not directed us to authority that extends the holding in *Cain* to divest a grantee of mineral rights after the grantor's death.

Second, in 1990, the supreme court overruled its 1962 *Cain* decision. *See Day & Co.*, 786 S.W.2d at 669–70. Orca does not offer a persuasive reason why we should retroactively apply the 1962 *Cain* decision to the time of H.J.'s death in 1934 but should not retroactively apply the 1990 *Day & Co.* decision that overruled *Cain*,[18] nor does Orca direct us to a pre-*Cain* decision, in effect in 1934, that supports the divesting result that Orca urges.

For all of these reasons, we overrule both of Orca's issues, which depend on its argument that the Langille Trust was a necessary party and was not joined

---

[18]As a general rule, Texas Supreme Court decisions apply retroactively. *Emps. Ret. Sys. of Tex. v. Putnam, LLC*, 294 S.W.3d 309, 325 (Tex. App.—Austin 2009, no pet.) (op. on reh'g).

in the litigation leading to the 1944 judgment.[19]  We also overrule JPMorgan's first issue, which challenges the validity and enforceability of the 1944 judgment on the basis of the asserted absence of the Langille Trust as a necessary party.

## Alleged Bona Fide Purchaser

In its related second and third issues, JPMorgan contends that (1) even if the 1944 judgment is not void or unenforceable, the effect of that judgment was only to declare the purported 1929 deed from the Moravitzes to H.J. voidable, not void *ab initio*; and (2) therefore, JPMorgan, whose predecessor[20] became trustee of the Red Crest Trust before the recording of the 1944 judgment and therefore did not have constructive notice of it, can rely on the 1929 deed to establish that it is a bona fide purchaser for value.  Appellees contend that the 1944 judgment declared the 1929 deed void and that therefore, JPMorgan cannot be a bona fide purchaser for value.  We need not conclude whether the 1929 deed was void or voidable at its inception because we hold that when the Karnes County district

---

[19]Appellees alternatively contend that even if the Langille Trust was not made a party through virtual representation, it was not a necessary party, and its absence does not render the 1944 judgment void.  Because we conclude that the Langille Trust was a party to the 1944 judgment through virtual representation, we do not address the parties' contentions concerning how the Langille Trust's absence would have affected the validity or applicability of that judgment.  We overrule all of appellants' arguments that depend on their premise that the Langille Trust was a necessary party and was not joined to the suit leading to the 1944 judgment.

[20]The Red Crest Trust was created in 1985 with Texas American Bank/Fort Worth named as trustee.  Through a series of mergers, Texas American Bank/Fort Worth eventually became JPMorgan.

court cancelled and held the deed for "naught" in 1944, no party could thereafter qualify as a bona fide purchaser while relying on that deed.

A person who acquires property in good faith, for value, and without actual or constructive notice of any third-party claim or interest is a bona fide purchaser. *Fletcher v. Minton*, 217 S.W.3d 755, 758 (Tex. App.—Dallas 2007, no pet.). A bona fide purchaser acquires a property interest without being subject to prior claims. *Madison v. Gordon*, 39 S.W.3d 604, 606 (Tex. 2001). But a party cannot be a bona fide purchaser for value when its chain of title includes a void deed. *See Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 168 (Tex. 2013) (citing *Wall v. Lubbock*, 52 Tex. Civ. App. 405, 410–11, 118 S.W. 886, 888 (Austin 1908, writ ref'd)); *Sanchez v. Telles*, 960 S.W.2d 762, 768 (Tex. App.—El Paso 1997, pet. denied) ("A deed which is void cannot pass title even to an innocent purchaser from the grantee.").

In their 1943 petition, the Moravitzes pled that in September 1929, H.J. approached them with an offer to "buy one[-]eighth of [their] royalty for a period of two years." According to the Moravitzes, H.J. said that if they did not agree to his offer, he "would drill a well next to their land and drain all the oil out from under it and they would get nothing, as [H.J.] had the land around them leased up." The Moravitzes pled that H.J.'s statement about having leased the land surrounding their property was known by him to be false. They also pled that relying on this false statement, John Moravitz signed an instrument that purported to convey "an undivided one[-]eighth of his royalty for a period of two years" but that Mary

22

refused to sign the instrument and that her signature was forged. Finally, they alleged that instead of the instrument conveying an undivided one-eighth of John's royalty, as he had agreed, it conveyed "an undivided fifteen-sixteenths . . . of all the minerals." The pleading stated,

> [The Moravitzes] allege that the statement made by the said H.J. McMullen that he was only purchasing one eighth . . . of the royalty in and under said land, and did without the knowledge of the said John W. Moravitz, insert in said instrument that it conveyed an undivided fifteen[-]sixteenths . . . of the minerals, constituted such a fraud on the part of McMullen that the interest obtained thereby . . . should be cancelled and held for naught by the decree of this court.

In its judgment rendered the next year, the Karnes County district court recited that it had considered the pleadings, evidence, and argument of counsel; that Mary had signed the 1929 deed, and that the 1929 deed was "cancelled and held for naught."

Comparing the Moravitzes' pleading with the Karnes County district court's judgment, JPMorgan argues that the trial court could not have found that the 1929 deed was forged (because the court found that Mary had signed it), that the only other ground pled by the Moravitzes for cancelling the deed was fraud, and that fraud makes a deed only voidable, not void. Even assuming the validity of this argument, however, we conclude that no party could have been a bona fide purchaser in relying on a voidable-at-inception 1929 deed after 1944, when the deed was cancelled and held for naught.

A deed that is voidable is "valid and represents prima facie evidence of title *until there has been a successful suit to set it aside.*" *Nobles v. Marcus*, 533

23

S.W.2d 923, 926 (Tex. 1976) (emphasis added); *see Ford v. Exxon Mobil Chem. Co.*, 235 S.W.3d 615, 618 (Tex. 2007) ("Deeds obtained by fraud are voidable rather than void, and remain effective *until set aside.*" (emphasis added)); *Lighthouse Church of Cloverleaf v. Tex. Bank*, 889 S.W.2d 595, 601 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (op. on reh'g) ("A voidable deed operates as valid and perfect *until set aside.*") (emphasis added)). The logical reciprocal implication of this statement is that when there has been a successful suit to set a once-voidable deed aside, it has at that point been voided, and it is no longer valid nor represents prima facie evidence of title. *See Brazzel v. Murray*, 481 S.W.2d 801, 803 (Tex. 1972) (explaining that a voidable act is "binding until disaffirmed"); *Pure Oil Co. v. Swindall*, 58 S.W.2d 7, 10 (Tex. Comm'n App. 1933, holding approved) (stating that under bona fide/innocent purchaser principles, "*until [a voidable] instrument has been declared to be void*, in an authoritative manner, persons who are ignorant of the circumstances under which the instrument was executed and delivered are entitled to consider it genuine" (emphasis added)); *Smith v. Thornhill*, 25 S.W.2d 597, 600 (Tex. Comm'n App. 1930, judgm't adopted) ("That which is voidable operates to accomplish the thing sought to be accomplished, *until the fatal vice in the transaction has been judicially ascertained and declared.*" (emphasis added)), *judgment vacated on other grounds on reh'g,* 34 S.W.2d 803 (Tex. Comm'n App. 1931, holding approved). Indeed, a voidable act, by definition, is one that "may be voided." *See* Black's Law Dictionary 1805 (10th ed. 2014); *see also*

24

Webster's Third New International Dictionary 2562 (2002) (defining "voidable" as "capable of being voided" or "capable of being adjudged void").

When an act is "naught"—as the Karnes County district court declared the 1929 deed—it has "no worth" or "*no existence*, importance, or effect." Webster's Third New International Dictionary 1508 (emphasis added). Thus, we conclude that the Karnes County district court's judgment that "cancelled and held for naught" the 1929 deed declared the deed void, worthless, and wholly ineffective at least as of 1944, regardless of whether the deed was void or merely voidable at its inception. *Cf. Poag v. Flories*, 317 S.W.3d 820, 825 (Tex. App.—Fort Worth 2010, pet. denied) ("A void deed is without vitality or legal effect."); *see also Bradford v. Thompson*, 470 S.W.2d 633, 635, 637 (Tex. 1971) (concluding that a foreclosure was "null and void" and therefore declaring that a trustee's deed arising from the foreclosure was "cancelled and held for naught"), *cert. denied*, 405 U.S. 955 (1972); Black's Law Dictionary 1805 (defining void to mean "[o]f no legal effect" or "null"). Likewise, we hold that from the time of the 1944 judgment forward, the 1929 deed, as being cancelled and voided, was ineffective to pass title even to any alleged innocent purchasers, including JPMorgan's predecessor.[21] *See Tex. Dep't of Transp.*, 397 S.W.3d at 168; *Sanchez*, 960

---

[21]JPMorgan acknowledges that the 1944 judgment "cancelled the [1929 deed] and vested title in the Moravitzes prospectively." Our holding in this case, in which JPMorgan's predecessor acquired its interest after the 1944 judgment, is distinguishable from a circumstance where a conveyance is made through a deed that is merely voidable, a party then becomes an innocent purchaser, and the original deed is thereafter challenged or cancelled.

25

S.W.2d at 768. In other words, while a voidable deed may convey property to an innocent purchaser, *see Slaughter v. Qualls*, 139 Tex. 340, 345, 162 S.W.2d 671, 674 (1942), the 1929 deed was no longer voidable in 1985, when JPMorgan's predecessor acquired its interest; instead, it had been affirmatively cancelled. *See Goodwin v. City of Dallas*, 496 S.W.2d 722, 723 (Tex. Civ. App.—Waco 1973, no writ) ("[A] voidable deed . . . effectually accomplishes the thing sought to be accomplished, *until* annulled in a suit brought for that purpose." (emphasis added)); *Harrison v. Craddock*, 178 S.W.2d 296, 301 (Tex. Civ. App.—Galveston 1944, no writ) ("When a judgment is obtained rescinding a voidable deed, a vested interest in property is thereby obtained.").

Although JPMorgan argues that the 1944 judgment was not recorded until 1991 (after JPMorgan's predecessor acquired the property as trustee) and that JPMorgan therefore did not have constructive notice of the judgment, JPMorgan cites no authority to establish that a party may be a bona fide purchaser when acquiring an interest that depends on a deed that has been previously voided or cancelled by an unrecorded judgment. We have not found such authority. Instead, JPMorgan relies on authority concerning unrecorded judgments that affected property conveyances but that did not cancel or void a deed. *See, e.g.*, *Woodward v. Ortiz*, 150 Tex. 75, 77, 237 S.W.2d 286, 288 (1951); *Permian Oil Co. v. Smith*, 129 Tex. 413, 443–46, 73 S.W.2d 490, 504–05 (1934); *Blocker v. Davis*, 241 S.W.2d 698, 700, 703 (Tex. Civ. App.—Fort Worth 1951, writ ref'd

26

n.r.e.); *cf. Tex. Dep't of Transp.*, 397 S.W.3d at 168 (stating that one holding under a void title cannot claim protection as an innocent purchaser).

We conclude and hold that because the Karnes County district court cancelled the 1929 deed and declared it as "naught" in 1944, the deed operated as void from at least that time forward, and JPMorgan's predecessor could not therefore qualify as a bona fide purchaser for value when acquiring its interest years later.[22] *See Tex. Dep't of Transp.*, 397 S.W.3d at 168; *Sanchez*, 960 S.W.2d at 768; *see also Swindall*, 58 S.W.2d at 10 (explaining that ignorance of defects in a deed is a defense to an innocent purchaser "until such an instrument has been declared to be void"). We therefore overrule JPMorgan's third issue in which it contends that it may "rely on the 1929 Mineral Deed to establish that it is a *bona fide* purchaser for value." And because a conclusion of whether the 1929 deed was void or voidable at its inception is not necessary to our determination of whether JPMorgan can qualify as a bona fide purchaser, we overrule

---

[22]At a hearing in the trial court, appellees made this argument. Their counsel contended,

> Judge, once it's voided, there's void ab initio which is, of course, forgery and things like that. And there's void or voidable . . . .
>
> . . . .
>
> [A]nd once it's voided, though, [and] adjudicated void, it's of no effect.
>
> And the case law says having recorded a void Deed, a Deed that is deemed void, whether void ab initio or voidable, doesn't give the Deed any validity.

JPMorgan's second issue, which challenges the trial court's finding that the 1929 deed was void *ab initio*, as moot.[23]  *See* Tex. R. App. P. 47.1; *XTO Energy Inc. v. Nikolai*, 357 S.W.3d 47, 59–60 (Tex. App.—Fort Worth 2011, pet. denied).

## Conclusion

Having overruled all of appellants' issues, we affirm the trial court's "Rule 166 Order on Legal Matters Decided by the Court" and uphold the trial court's findings that (1) the 1944 judgment is valid and enforceable against all parties in this cause, and (2) appellants cannot rely on the 1929 deed to establish the defense of a bona fide purchaser for value without notice of a conflicting claim to ownership of the property.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER and MEIER, JJ.

DELIVERED:  July 16, 2015

---

[23]JPMorgan appears to challenge this finding only for the purpose of establishing its position as a bona fide purchaser.