

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---------------------------------------------

No. 02-17-00387-CV

---------------------------------------------

LOUIS DORFMAN; K I HOLDINGS, LTD.; SAM MYERS; J.M.D. RESOURCES, INC.; BILLY COGDELL BOWDEN; BARBARA STANDFIELD; STACEY DORFMAN-KIVOWITZ; JULIA DORFMAN; MARK DORFMAN; DAVID PHILIP COOK; CHERYL KING COOK; SAM Y. DORFMAN JR.; FRANK MORAVITS, INDIVIDUALLY AND AS TRUSTEE OF THE MORAVITS CHILDREN TRUSTS NOS. 1 AND 2; SHELBY MORAVITS; AND JERRY KORTZ, Appellants

V.

JPMORGAN CHASE BANK, N.A., IN ITS INDIVIDUAL CAPACITY AND AS TRUSTEE OF THE RED CREST TRUST; ORCA/ICI DEVELOPMENT; ORCA PETROLEUM, LTD.; AND ORCA ASSETS, G.P., L.L.C., Appellees

---

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-259139-12

---

Before Sudderth, C.J.; Gabriel and Pittman, JJ.
Memorandum Opinion by Justice Gabriel

**MEMORANDUM OPINION**

Once again, we are asked to determine the effects of mineral leases on a 200.1-acre tract in Karnes County (the tract). Previously, we agreed with the trial court's interlocutory determination that Appellants held ownership and development rights to the tract under a 1944 judgment, which rendered a prior 1929 deed void *ab initio*. *Orca Assets, G.P. v. Dorfman*, 470 S.W.3d 153, 164, 167 (Tex. App.—Fort Worth 2015, pets. denied) (permissive appeal). We now must determine whether the trial court erred by granting Appellees judgment as a matter of law on Appellants' tort claims, which were based on Appellees' actions in entering into the disputed mineral-rights transactions on the tract. We conclude that Appellees were entitled to judgment as a matter of law on Appellants' tort claims primarily because Appellees had a reasonable, good-faith basis on which to assert title.

## I.  BACKGROUND

### A.  TRACING OWNERSHIP OF THE TRACT'S MINERAL RIGHTS

To place the current issues in context, we find it necessary to replow some of the same factual ground as before. In 1901, William Mayfield conveyed the tract to Mary Moravits. In 1929, Mary and her husband J.W. Moravits conveyed an undivided 15/16 interest in all minerals to H.J. McMullen, retaining a 1/16 royalty interest. McMullen then conveyed the executive right and the right to execute mineral leases to his oil and gas company, McMullen Oil & Royalty Co. But McMullen retained the right to receive royalty payments. When McMullen died in 1934, his interest in the

2

tract passed to his wife Susie McMullen, who remarried and became Susie Langille. Upon her death in 1938, her interest in the tract was placed in a trust—the Langille Trust—that she had created for the benefit of her surviving children. The trustee of the Langille Trust eventually became appellee JPMorgan Chase Bank, N.A.

In 1943, Mary Moravits and her sons filed suit to cancel the 1929 deed to H.J. McMullen. During the litigation, McMulllen Oil disclaimed any interest in the tract. In 1944, the trial court signed a judgment that "cancelled and held for naught" the 1929 deed and declared that title to the minerals belonged to Mary Moravits and her sons.

In 1961, JPMorgan's predecessor as trustee of the Langille Trust conveyed any mineral interests remaining in the Langille Trust to McMullen Oil but reserved a royalty. In 1966, McMullen Oil dissolved and conveyed to the Langille Trust any mineral interest that it owned.

The Langille Trust terminated in 1984, and the res was distributed to Susie Langille's grandchildren. The grandchildren created the Red Crest Trust to hold their inherited mineral interests. As with the Langille Trust, JPMorgan eventually became the trustee of the Red Crest Trust through several bank mergers. The 1944 judgment, voiding the 1929 deed and declaring Mary Moravits and her sons to be the owners of the tract's mineral interests, was recorded in Karnes County in 1991.

## B. The Disputed Transactions Involving the Tract

On April 6, 2009, the Moravitses[1] leased the mineral rights on thirty-three acres of the tract to Moffit & Associates, Inc. The lease was recorded in Karnes County on June 10, 2009. On July 28, 2010, Moffit assigned its lease interest to Petro-Hunt, LLC. Moffitt recorded the assignment in Karnes County on September 20, 2010.

During the summer of 2010, JPMorgan as trustee of the Red Crest Trust began receiving inquiries from oil-company landmen about possible leases for the mineral rights on at least a portion of the tract. One of those inquiries came from Joan Stewart, a landman for appellee Orca Assets G.P., L.L.C. (Orca Assets). On September 8, Stewart emailed Philip Mettham, a JPMorgan employee who was primarily responsible for the oil and gas interests contained in the Red Crest Trust, and stated that Orca Assets wanted to lease "the 458.1 acres in Karnes," which included the tract, for $3,500 per acre. Stewart also stated that "there seems to be a problem with the title" but that Orca Assets was "prepared to defend" the title on behalf of the Red Crest Trust because she believed the problem could "be cured in . . . favor [of the Red Crest Trust]." She gave no information regarding the nature of the title "problem," and Mettham did not inquire further. Mettham stated that at the time the lease with Orca Assets was signed, "nothing in [JPMorgan's] records

---

[1]We use "the Moravitses" to refer collectively to appellants Frank Moravits, individually and as trustee of the Moravits Children Trusts Nos. 1 and 2; Shelby Moravits; and Jerry Kortz.

4

[showed] that the Red Crest Trust did not own that acreage." He further explained that Orca Assets was aware the lease would be granted "without warranties."

On October 5, JPMorgan as the trustee of the Red Crest Trust leased the tract's minerals to Orca Assets for a three-year primary term.[2] The lease provided that it was "made without warranties of any kind, either express or implied." The lease contract required Orca Assets to record a "Memorandum of Oil and Gas Lease" in Karnes County, which occurred on October 18. As relevant to this appeal, the recorded memorandum described the leased premises: "200.1 acres, more or less, being all of the land described in Deed from William I. Mayfield to J. W. Moravit[s], dated March 16, 1901 and recorded in Volume Y, Page 621 of the Deed Records of Karnes County, Texas."

On November 3 after the lease between JPMorgan and Orca Assets was signed and recorded, two employees of appellee Orca Petroleum, Ltd.—land administrator Tiffanie Cozean and land manager Ellis McConn—exchanged the "runsheets" for the tract by email with no comment.[3] The runsheets showed the Moravitses' 2009 leases

---

[2]The lease also included 258 adjacent acres that are not at issue in this appeal.

[3]A runsheet is generally prepared by a landman in anticipation of a more formal title examination:

A landman, usually hired by the client, identifies from the county indexes, whether they are maintained by a[] private online provider, or are computerized indexes maintained by the county, or from the hard-copy indexes in the county, all the recorded instruments affecting the tract of land under examination. The landman prepares an index or

to Moffitt for thirty-three acres of the tract but not the 1944 judgment. The record does not clearly indicate who prepared the runsheets for Orca Assets or when they were prepared. Before signing the lease with Orca Assets, Mettham had not reviewed any runsheets.

On November 15, Dorfman Production Company entered into an agreement to buy 50% of the mineral interests to two 33.62-acre parcels contained in the tract from Frank Moravits, individually and as the trustee for two Moravits trusts (Frank). Frank represented that he "own[ed] marketable title to the Conveyed Mineral Interest" and that "to the best of [his] knowledge, there is an existing, written, recorded, oil, gas, and mineral lease covering all or a portion of the Lands." But the agreement specified that if Dorfman Production discovered a title defect that Frank was unable to cure, Dorfman Production "in its sole discretion" could terminate the agreement. On the same day as the agreement, the chairman of Dorfman Production,

---

runsheet listing all those instruments and then obtains copies of all the instruments listed.

. . . .

While defined as "a list of all instruments to be examined in preparation of a title opinion," the term has no real definition in fact. . . . Usually a runsheet is prepared for purposes of conducting a [separate] "standup title" examination [in the county clerk's office].

Allen D. Cummings, *Basis of Opinions, Types of Opinions, and Layout of Opinions*, *in* Rocky Mountain Mineral Law Found., Nuts and Bolts of Mineral Title Examination, Paper No. 3, at *3-5–3-6 (Feb. 9, 2012).

appellant Louis Dorfman, forwarded the agreement to a landman, Roger A. Soape, to run a title search of the two parcels.

On November 30, Soape informed Louis that Frank "owns full mineral interest in" the two parcels and that there were "no outstanding royalty interest[s] of record." The attached documentation showed the 1944 judgment, rendering the 1929 deed "NULL," but did not reflect JPMorgan's lease to Orca Assets, presumably because Soape was tasked with researching title and not any leasehold status. On December 1, Frank signed deeds conveying 50% of the mineral interests of the two parcels in favor of Dorfman Production. On December 30, Dorfman Production conveyed its mineral interest in the two parcels to the Dorfmans.[4] Orca Assets states that this conveyance was recorded in Karnes County on January 3, 2011, but there seems to be no summary-judgment evidence supporting this assertion.[5]

On December 10, 2010, close in time to Frank's conveyance to Dorfman Production, Petro-Hunt conveyed and assigned its interest in the Moravitses' 2009 lease to Petrohawk Properties, LP.

---

[4]We use "the Dorfmans" to refer collectively to Louis and to appellants K.I. Holdings, Ltd.; Sam Myers; J.M.D. Resources, Inc.; Billy Cogdell Bowden; Barbara Standfield; Stacey Dorfman-Kivowitz; Julia Dorfman; Mark Dorfman; David Philip Cook; Cheryl King Cook; and Sam Y. Dorfman Jr.

[5]Although Dorfman Production had the unilateral right to terminate the conveyance from Frank in the face of any unresolvable title issue, there is no indication that Dorfman Production or its assignees, the Dorfmans, availed themselves of this contractual right.

To sum up, Petrohawk's and the Dorfmans' interest in the tract flowed from the 1901 deed from William Mayfield to Mary Moravits. JPMorgan's and Orca Assets' interest in the tract flowed from the 1929 deed from Mary and J.W. Moravits to H.J. McMullen.

## C. LITIGATION

On March 31, 2011, McConn contacted an Orca Assets landman, Tony Villalon, and enclosed a copy of the 1944 judgment, which McConn had received from Petrohawk—the ultimate assignee of Moffit's interest in its 2009 lease from the Moravitses. McConn stated that Orca Assets was getting a "title opinion" on the issue but noted that Orca Assets' runsheets had not shown the judgment, which he recognized "basically states that the Mineral Deed from J.W. Moravits to H.J. McMullen is null and does not convey the minerals." Villalon responded that in his view, Orca Assets' lease on the tract was "valid" and "good," but he asked Cozean to get the "entire file" from Karnes County. Villalon informed McConn that the requested title opinion might not be useful depending on what documents the author relied on, but he averred that the opinion could be disregarded or amended based on any missing documentation.[6]

---

[6]Contrary to the Moravitses and the Dorfmans' assertion in their brief, the summary-judgment evidence does not reflect that Villalon "aborted" the title opinion "because it would have concluded that the Orca Lease was invalid."

8

On May 23, Orca Assets sent a memo to Petrohawk, explaining that Orca Assets believed its interest in the tract was superior to Petrohawk's because the Red Crest Trust—Orca Assets' lessor—had been a bona fide purchaser, notwithstanding the 1944 judgment.

On June 3, 2011, an attorney representing at least some of the Dorfmans emailed Mettham about the Dorfmans' competing-title claim and attached the 1929 deed, McMullen Oil's disclaimer of interest filed in Mary Moravits's 1943 suit, and the 1944 judgment. The attorney asked JPMorgan to sign a quitclaim of its interest in the tract to benefit the Dorfmans "as well as others who have relied on the disclaimer and judgment" and posited that JPMorgan followed its policies in signing the lease to Orca Assets:

> Mr. Dorfman believes that this may be the situation:
>
> • That the [Red Crest] [T]rust owns a great deal of minerals and leases them on a regular basis.
>
> • That it is not the policy of [JPMorgan], when approached for a lease, to defer leasing until it has obtained a title opinion affirming the quality of title in the trust. Rather, [JPMorgan] follows the conventional approach of fiduciaries—grant a lease when requested but with no warranty of title.
>
> • That this situation is unusual—if not unique. [JPMorgan] was unaware of [McMullen Oil's] disclaimer of interest. Had it known of the disclaimer, it would have wished [to] honor the judgment and action of McMullen and not given a lease over the Moravit[s] acreage [i.e., the tract].

9

## 1. Claims and Counterclaims

Petrohawk filed suit against Orca Assets and JPMorgan on June 22, 2011, seeking to resolve the title question by bringing claims for trespass to try title, to quiet title, and for a declaratory judgment. On May 3, 2012, the Dorfmans filed suit against JPMorgan, the Orca Entities,[7] and other defendants not parties to this appeal, raising the same title claims as Petrohawk but also alleging several tort claims: slander of title; tortious interference with existing and prospective contractual relationships; tortious interference with property rights; negligence; gross negligence; and negligent hiring, retention, or supervision (negligent employment).[8] Orca Assets filed a third-party petition in the Dorfmans' suit naming the Moravitses as third-party defendants and alleging title claims. The trial court consolidated Petrohawk's suit and the Dorfmans' suit. The Moravitses then filed counterclaims against the Orca Entities and JPMorgan, raising the same title and tort claims alleged by the Dorfmans.

---

[7]Our use of "the Orca Entities" includes Orca Assets; appellee Orca/ICI Development; and appellee Orca Petroleum, Ltd. In the trial court and in this court, the parties do not attempt to clearly delineate which of the Orca entities engaged in what tortious action. The parties merely alleged "Orca" in their trial-court pleadings and continue that practice here. To the extent possible in our factual recitation, we stated with particularity which Orca entity did what. But because the Dorfmans and, later, the Moravitses generally alleged their claims against "Orca" and because the Orca Entities did not point out the discrepancy in the trial court, we will follow suit and assume all claims were alleged against each of the Orca Entities.

[8]The negligent-employment claim was raised only against JPMorgan regarding its employment of Mettham. The Dorfmans and, later, the Moravitses also raised claims for conspiracy against JPMorgan and the Orca Entities but nonsuited them.

### 2. Summary Judgment: Title Claims

As would be expected, the predicate issue for the trial court was who held superior title to the tract, which turned on the validity of the 1929 deed in light of the 1944 judgment, which "cancelled" the 1929 deed and conferred title on the Moravitses. All parties moved for summary judgment on the issue of title, and the trial court concluded that the 1929 deed was void *ab initio* based on the 1944 judgment and that JPMorgan and the Orca Entities could not rely on the 1929 deed to establish superior title. *Orca Assets*, 470 S.W.3d at 157–58. In a subsequent permissive appeal from the interlocutory order, we agreed with the trial court and affirmed its order. *Id.* at 167.

### 3. Summary Judgment: Tort Claims

JPMorgan then moved for a traditional and no-evidence summary judgment on the Dorfmans' and the Moravitses' tort claims and moved for a traditional summary judgment on its affirmative defense of limitations. To defeat the tort claims, JPMorgan averred that the Dorfmans and the Moravitses failed to raise a genuine issue of material fact on or produced no evidence of each element of their tort claims and that their lost-profits evidence was speculative and lacked reasonable certainty. The Orca Entities also moved for judgment as a matter of law under either the traditional or no-evidence standard, essentially raising the same arguments asserted by JPMorgan to defeat the tort claims, and moved for a traditional summary judgment on their affirmative defense of limitations. The Dorfmans and Moravitses similarly

sought summary judgment on their claims for slander of title against JPMorgan and the Orca Entities and for negligent employment against JPMorgan. They also sought judgment as a matter of law on JPMorgan's and the Orca Entities' affirmative defense of limitations. The trial court noted that this flurry of summary-judgment motions presented a subsidiary, yet dispositive, question regarding the tort claims: Given that the Red Crest Trust did not have an interest in the tract based on the 1944 judgment, did JPMorgan as the trustee for the Red Crest Trust have a good-faith or reasonable belief that it did?

After a nonevidentiary hearing, the trial court orally granted JPMorgan's and the Orca Entities' summary-judgment motions without specifying the grounds. In the subsequent order, which included finality language, the trial court granted JPMorgan's and the Orca Entities' summary-judgment motions and rendered judgment in their favor on the Dorfmans' and the Moravitses' tort claims.

## II. PROPRIETY OF SUMMARY JUDGMENT ON TORT CLAIMS

In their first issue, the Dorfmans and the Moravitses (collectively, the Owners) assert that the trial court erred by granting summary judgment on their tort claims in favor of JPMorgan and the Orca Entities. Because JPMorgan and the Orca Entities moved for summary judgment on both no-evidence and traditional grounds, we

address their no-evidence motions first.[9]  *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

## A. STANDARD OF REVIEW

Once JPMorgan and the Orca Entities specifically asserted that there was no evidence of one or more essential elements applicable to each of the Owners' claims, the burden of proof shifted to the Owners to produce more than a scintilla of summary-judgment evidence—more than a mere surmise or suspicion of a fact—creating a genuine issue of material fact as to the existence of the challenged element. *See* Tex. R. Civ. P. 166a(i); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Ford Motor*, 135 S.W.3d at 600–01; *Morgan v. Anthony*, 27 S.W.3d 928, 929 (Tex. 2000); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).  The trial court must grant the no-evidence motions if the Owners failed to do so.  *See* Tex. R. Civ. P. 166a(i) & cmt.  But if the Owners brought forward more than a scintilla of probative evidence that raised a genuine issue of material fact on the challenged elements, then a no-evidence summary judgment was not proper.  *See Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009).

---

[9]In certain instances, we may address a traditional motion first or may address the motions in tandem.  *See, e.g.*, *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *Poag v. Flories*, 317 S.W.3d 820, 825 (Tex. App.—Fort Worth 2010, pet. denied).  But in this case, we need not address the traditional motions based on our analysis of the no-evidence motions.

In reviewing the trial court's ruling, we look at the entire record in the light most favorable to the plaintiff, indulging every reasonable inference and resolving any doubts against the motion. *See Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). And we, as was the trial court, are confined in our review to those grounds specifically raised by JPMorgan and the Orca Entities in their motions. *See McConnell v. Southside ISD*, 858 S.W.2d 337, 341 (Tex. 1993).

## B. SLANDER OF TITLE

Slander of title, as relevant here, requires evidence that (1) the Owners possessed an interest in the property slandered, (2) JPMorgan and the Orca Entities published a false statement about the title to the property, (3) the statement was published with legal malice, and (4) the publication caused the loss of a specific sale—special damages. *See Duncan Land & Expl., Inc. v. Littlepage*, 984 S.W.2d 318, 332 (Tex. App.—Fort Worth 1998, pet. denied) (citing *Williams v. Jennings*, 755 S.W.2d 874, 879 (Tex. App.—Houston [14th Dist.] 1988, writ denied)); *see also Marrs & Smith P'ship v. D.K. Boyd Oil & Gas Co.*, 223 S.W.3d 1, 20 (Tex. App.—El Paso 2005, pet. denied). Both JPMorgan and the Orca Entities asserted in the trial court that the Owners had produced no evidence of or failed to raise a genuine fact issue regarding legal malice or the loss of a specific sale.[10] Because we conclude that the summary-judgment evidence on these two elements of slander of title constituted less than a scintilla, the

---

[10]JPMorgan and the Orca Entities attacked other elements of the Owners' slander claim, but we begin, and ultimately end, with these two.

14

trial court did not err by granting JPMorgan's and the Orca Entities' no-evidence motions directed to this claim.

### 1. Malice

In a claim for slander of title, legal malice means making a false statement without reasonable cause regarding title either in the absence of color of title or under a reasonable belief that the speaker had title. *See Duncan Land*, 984 S.W.2d at 332; *Santa Fe Energy Operating Partners, L.P. v. Carrillo*, 948 S.W.2d 780, 785 (Tex. App.—San Antonio 1997, writ denied). In other words, malice is not present if a claim "is made under color of title upon the advice of attorneys, or upon reasonable belief that a party has title to the property acquired." *Humble Oil & Refining Co. v. Luckel*, 171 S.W.2d 902, 906 (Tex. Civ. App.—Galveston 1943, writ ref'd w.o.m.). The Owners argued that JPMorgan and the Orca Entities published the lease memorandum with malice because JPMorgan did not have colorable title by which to lease the tract's minerals. Their argument essentially boils down to an assertion that because the trial court and this court ultimately determined that the 1901 deed and the 1944 judgment were the operative documents for title purposes, there were no circumstances under which JPMorgan could have reasonably believed it had title to the mineral interests for the tract.

The summary-judgment evidence, even viewed in favor of the Owners, that indicated JPMorgan and the Orca Entities had an unreasonable—not good-faith—belief that JPMorgan held title to the tract's mineral interests when it entered into the

15

lease with Orca Assets was less than a scintilla and created at best a mere surmise or suspicion of this element. *Cf. Misco Leasing, Inc. v. Keller*, 490 F.2d 545, 548 (10th Cir. 1974) (recognizing malice in slander-of-title claim is "the principal element . . . and the one most difficult to prove"). After the lease was recorded, ownership of the tract was hotly disputed with all involved parties staking some claim based on competing title evidence. *Orca Assets*, 470 S.W.3d at 157–58. JPMorgan relied on the 1929 deed to trace its ownership to the tract's minerals and raised several legal arguments supporting its position that it held title, several of which accounted for the possibility that the 1944 judgment validly "cancelled" the 1929 deed. *Id.* at 157. Although these arguments were unavailing at the end of the day, they evinced the reasonableness of JPMorgan and Orca Assets' belief under the applicable law that JPMorgan held title to the tract. *See id.* at 158–67. The Dorfmans' counsel recognized that JPMorgan followed the "conventional approach of fiduciaries" by granting Orca Assets a lease with no warranty of title and did so with no prior knowledge of the 1944 disclaimer and judgment. Although JPMorgan and Orca Assets had some indication that there was a "problem" with the title before the lease was signed, at no point did the summary-judgment evidence reveal that they deliberately acted in contravention of the 1944 judgment under no reasonable claim to title. *See generally Williams*, 755 S.W.2d at 882 (defining malice in context of slander-of-title claim as "deliberate conduct without reasonable cause").

16

We conclude that the Owners produced no more than a scintilla of evidence that JPMorgan or Orca Assets acted with the requisite legal malice in entering into and recording the lease; therefore, JPMorgan and the Orca Entities were entitled to judgment as a matter of law. *See Preston Gate, LP v. Bukaty*, 248 S.W.3d 892, 896 (Tex. App.—Dallas 2008, no pet.); *Jones v. Rabson & Broocks, L.L.C.*, No. 01-01-01210-CV, 2003 WL 302439, at *5 (Tex. App.—Houston [1st Dist.] Feb. 13, 2003, no pet.) (mem. op.); *Storm Assocs., Inc. v. Texaco, Inc.*, 645 S.W.2d 579, 580–82, 588–89 (Tex. App.—San Antonio 1982), *aff'd on other grounds sub nom. Friedman v. Texaco, Inc.*, 691 S.W.2d 586 (1985); *cf. Williams*, 755 S.W.2d at 882–83 (holding because appellants had constructive notice that deed passed no title, it was unreasonable for appellants to not check title, supporting slander-of-title verdict); *Walker v. Ruggles*, 540 S.W.2d 470, 473–74 (Tex. Civ. App.—Houston [14th Dist.] 1976, no writ) (finding sufficient evidence of malice to support slander of title where real-estate agents recorded unexecuted earnest-money contract and circulated false letter to title companies stating they had judgment against homeowners), *overruled on other grounds by A. H. Belo Corp. v. Sanders*, 632 S.W.2d 145, 146 (Tex. 1982). *See generally Duncan Land*, 984 S.W.2d at 332 (quoting *Williams* and defining malice to require deliberate conduct with no reasonable cause).

## 2. Special Damages

Both JPMorgan and the Orca Entities argued to the trial court and continue to assert on appeal that the Owners produced no evidence of or raised no fact issue

17

regarding special damages—the loss of a specific, pending sale—which is an essential element of slander of title. *See Ellis v. Waldrop*, 656 S.W.2d 902, 904–05 (Tex. 1983); *Shell Oil Co. v. Howth*, 159 S.W.2d 483, 490 (Tex. 1942). The Owners assert that because of the lease between JPMorgan and Orca Assets, Petrohawk was not able to "develop" the tract after Murphy Oil "walked away" from "a prospective business relationship." The Owners proffered the deposition testimony of Ronald Berry, a former Petrohawk employee, who stated that Petrohawk and Murphy Oil had a prior relationship and had intended to "trade" acreage in Karnes County to "help [Petrohawk] get a hundred percent well and give [Murphy] what [Petrohawk] thought to be a hundred percent well on using [the tract]." Berry averred that Murphy Oil lost interest in trading for the tract in May 2011 after Orca Assets asserted its leasehold interest, which caused the Owners to "miss[] the production window . . . when the average price per barrel was consistently $100–110." He stated that Murphy Oil stopped negotiating with Petrohawk not only because Petrohawk "couldn't guarantee [Murphy Oil] clear title" but also because Frank had conveyed part of his interest to another "portion of the family," which Berry described as "kind of a mess."

This prospective deal between Murphy Oil and Petrohawk is no evidence of the Owners' loss of a specific and pending sale, which is required in a slander-of-title claim. *See A. H. Belo*, 632 S.W.2d at 145–46 (noting slander of title cannot be supported by evidence of impairment of vendibility). The Owners were not involved in the talks between Murphy Oil and Petrohawk about a land swap to develop the two

18

companies' mineral interests in Karnes County. Kane Heinen, the Murphy Oil employee who discussed the potential swap with Berry, stated that Murphy Oil had discovered the proposed swap with Petrohawk was unnecessary because Murphy Oil could fully develop its Karnes County acreage without Petrohawk's interest.

The Owners assert that Heinen's testimony does not defeat their proof on this slander-of-title element because they did not allege that Murphy Oil needed the tract to develop its own acreage but instead alleged "that, but-for the Orca Lease, Murphy [Oil] would have included the [tract] in its development." Heinen's testimony shows that the proposed swap deal was not pending such that the proposed swap equated to more than a scintilla of evidence regarding the Owners' loss of a specific, pending sale. Further, Heinen's testimony negates any causation arising from the recordation—even in the absence of the recorded lease between JPMorgan and Orca Assets, Murphy Oil ultimately would not have entered into the swap because it did not need the tract to develop its acreage. *See generally* Restatement (Second) of Torts § 633 cmt. c (Am. Law Inst. 1977) ("The disparaging matter may prevent a sale by causing an intending purchaser to withdraw an offer already made or otherwise to terminate negotiations *that were reasonably certain to result in a sale.*" (emphasis added)).

The discussions between Petrohawk and Murphy Oil never progressed from the preliminary stage. Indeed, there is no evidence of the particular terms of the swap. *See Ellis*, 656 S.W.2d at 906 (Spears, J., concurring) (recognizing damages in slander-of-title claim "must be proven with sufficient certainty and particularity to

19

avoid the need for speculation or conjecture by the fact finder"). The proposed swap between Petrohawk and Murphy Oil was not a pending sale that was "frustrated" by the recordation of the memorandum of lease between JPMorgan and Orca Assets. *Allen-Pieroni v. Pieroni*, 535 S.W.3d 887, 889 (Tex. 2017). Because there was no evidence of a specific, pending sale lost by the Owners, their slander-of-title claim could not stand as a matter of law. *See U.S. Enercorp, Ltd. v. SDC Mont. Bakken Expl., LLC*, 966 F. Supp. 2d 690, 699–702 (W.D. Tex. 2013); *Marrs & Smith P'ship*, 223 S.W.3d at 20–21; *Halliburton Co. v. Can-Tex Energy Corp.*, No. 05-00-00309-CV, 2001 WL 737542, at *3 (Tex. App.—Dallas July 2, 2001, pet. denied) (not designated for publication); *Tex. Am. Corp. v. Woodbridge Jt. Venture*, 809 S.W.2d 299, 304 (Tex. App.—Fort Worth 1991, writ denied).

### C. NEGLIGENCE

The Owners raised negligence and gross-negligence claims against JPMorgan and the Orca Entities, alleging that JPMorgan and the Orca Entities owed them a duty to avoid placing a cloud on their interests in the tract; that they knew of the Owners' competing claim but refused to sign a quitclaim; and that it was foreseeable that their wrongful claim to the tract "would prevent oil companies from drilling, producing and selling the minerals." The Owners also raised a negligent-employment claim against JPMorgan, alleging that it owed them a duty to use ordinary care in hiring, training, and supervising Mettham and had breached that duty as shown by Mettham's signing the lease with Orca Assets. JPMorgan and Orca Assets argued in the trial

20

court that the Owners failed to carry their summary-judgment burden to proffer evidence either that they owed the Owners a legal duty based on their good-faith claim to a mineral interest or that there was a breach of a duty proximately causing the Owners injury.

JPMorgan and the Orca Entities are correct that the existence of a defendant's legal duty to a plaintiff is an essential element of any claim grounded in negligence. *See, e.g.*, *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990); *Ins. Network of Tex. v. Kloesel*, 266 S.W.3d 456, 467 (Tex. App.—Corpus Christi 2008, pet. denied). The Owners' negligence-based claims arose from Mettham's and JPMorgan's leasing the minerals to the tract to Orca Assets and thereafter JPMorgan's failure to quitclaim its interest at the Dorfmans' attorney's request. As we explained regarding slander of title, JPMorgan and Orca Assets had a reasonable basis upon which to assert a competing title claim. It follows that because JPMorgan and Orca Assets had a reasonable basis to assert title in the face of the Owners' competing title claims, they owed no legal duty to the Owners to not pursue that colorable claim. *See Howell v. Aspect Res., LLC*, No. 09-10-00349-CV, 2011 WL 4389560, at *5–6 (Tex. App.— Beaumont Sept. 22, 2011, pet. denied) (mem. op. on reh'g); *cf. Sw. Guar. Tr. Co. v. Hardy Rd. 13.4 Jt. Venture*, 981 S.W.2d 951, 954 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (recognizing claim for failure to release purported property interest is one for slander of title, not negligence). And because the Owners' slander-of-title claim failed as a matter of law based on JPMorgan's and the Orca Entities' reasonable basis

21

to assert title, the Owners' negligence-based claims must fail as well. *See Ellis*, 656 S.W.2d at 905 (explaining cause of action for failure to release purported property interest is a claim for slander of title); *Howell*, 2011 WL 4389560, at *5 ("[B]reach of this common law duty [to release an expired lease even though the terms of the lease do not require release] gives rise to a cause of action for slander of title."); *Sw. Guar. Tr.*, 981 S.W.2d at 954 (recognizing failure to release property interest does not give rise to negligence claim).

The Owners contend that JPMorgan did not argue on summary judgment that the Owners' negligence-based claims are simply a slander-of-title horse of a different color; therefore, this ground cannot support the trial court's summary judgment. However, JPMorgan argued that Texas law did not support the Owners' position "that parties with good faith claims to a mineral interest owe any legal duties to one another" and that it owed no legal duty to the Owners based on that good-faith belief. And in their response to JPMorgan's summary-judgment motion, the Owners recognized JPMorgan's position to be that a good-faith title dispute could not give rise to tort liability. We conclude that JPMorgan gave fair notice in its summary-judgment motion of this legal theory, and the trial court could have relied on it in granting a no-evidence summary judgment in JPMorgan's favor. *See Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310–11 (Tex. 2009) (imposing "fair notice" standard to review of substance of summary-judgment grounds).

In summary, there was no evidence that JPMorgan or the Orca Entities owed a duty to the Owners because, as a matter of law, they had a good faith belief that JPMorgan held title to the tract. Accordingly, the trial court did not err by granting JPMorgan and the Orca Entities a no-evidence summary judgment on the Owners' negligence-based claims.

## D. TORTIOUS INTERFERENCE

### 1. With Property Rights

The Owners alleged that JPMorgan's and the Orca Entities' intentional actions in leasing the tract interfered with the Owners' right to the use and enjoyment of the tract and were done without just cause.[11] A claim of tortious interference with property rights requires proof that (1) there was an interference with one's property rights, (2) the interference was intentional and caused damages, and (3) the interference was conducted without just cause or legal excuse. *See Robles v. Mann*, No. 13-14-00211-CV, 2016 WL 1613316, at *7 (Tex. App.—Corpus Christi Apr. 21, 2016, no pet.) (mem. op.). JPMorgan and the Orca Entities argued in the trial court that the Owners produced no evidence or failed to raise a genuine and material fact issue that JPMorgan and the Orca Entities willfully intended to interfere with the Owners' property rights. As we discussed regarding the Owners' slander-of-title

---

[11]This type of interference-with-property claim is, "in essence, a claim for intentional invasion of, or interference with, property rights." *Surprise v. DeKock*, 84 S.W.3d 378, 382 (Tex. App.—Corpus Christi 2002, no pet.).

claim, the Owners, as a matter of law, proffered no more than a scintilla of summary-judgment evidence that JPMorgan and Orca Assets acted without just cause or legal excuse by entering into the lease—the third element of the Owners' claim for interference with their property rights. Therefore, JPMorgan and the Orca Entities were entitled to a no-evidence summary judgment on this claim. *See In re ACM-Tex., Inc.*, 430 B.R. 371, 417 (Bankr. W.D. Tex. 2010); *Edberg v. Laurel Canyon Ranch Architectural Review Comm.*, No. 04-10-00395CV, 2011 WL 541134, at *5–6 (Tex. App.—San Antonio Feb. 16, 2011, pet. denied) (mem. op.); *cf. Marrs & Smith P'ship*, 223 S.W.3d at 21 (holding that legally sufficient evidence of slander of title similarly supported claim for intentional interference with property rights).

### 2. With Existing Contractual Relationships

The Owners alleged that JPMorgan's and the Orca Entities' actions in entering into the 2010 lease tortiously interfered with "the Petrohawk Leases," an existing contractual relationship. The elements of this claim required the Owners to show (1) the existence of a contract subject to interference, (2) a willful and intentional act of interference, (3) a proximate cause of the Owners' damages was the interfering act, and (4) actual damage or loss. *See Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996) (op. on reh'g). JPMorgan and the Orca Entities asserted that they were entitled to judgment as a matter of law, under either rule 166a(b)–(c) or rule 166a(i), because the Owners failed to meet their summary-judgment burden as to any of these elements. Indeed, to establish a willful and intentional act of interference, there must

24

be evidence that the defendant was more than a willing participant—the defendant knowingly induced one of the contracting parties to breach its obligations under the contract or knowingly made performance more burdensome or difficult. *Greenville Automatic Gas Co. v. Automatic Propane Gas & Supply, LLC*, 465 S.W.3d 778, 786–87 (Tex. App.—Dallas 2015, no pet.); *AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 236 (Tex. App.—Dallas 2012, no pet.); *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). "Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference." *ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

Again, our holding regarding the Owners' slander-of-title claim portends our holding for this claim. We held as a matter of law that the Owners failed to proffer more than a scintilla of evidence that JPMorgan and the Orca Entities acted with malice by entering into the lease, thwarting their slander-of-title claim. And we have concluded that there is no summary-judgment evidence that JPMorgan and the Orca Entities acted without just cause or legal excuse regarding the Owners' claim for tortious interference with their property rights. Similarly, there is no summary-judgment evidence that JPMorgan and the Orca Entities acted willfully or intentionally in light of JPMorgan's reasonable claim to title and JPMorgan's and the Orca Entities' actions taken with just cause or legal excuse. *See Mark III Sys., Inc. v. Sysco Corp.*, No. 01-05-00488-CV, 2007 WL 529960, at *5–6 (Tex. App.—Houston [1st Dist.] Feb. 22, 2007, no pet.) (mem. op.); *N.Y. Life Ins. Co. v. Miller*, 114 S.W.3d

25

114, 125 (Tex. App.—Austin 2003, no pet.); *Software Sys., Inc. v. Res. Support Assocs., Inc.*, No. 05-01-00864-CV, 2002 WL 1788007, at \*2–3 (Tex. App.—Dallas Aug. 5, 2002, no pet.) (not designated for publication). Accordingly, the Owners produced no or less than a scintilla of evidence on an essential element of their claim for tortious interference with existing contractual relationships. JPMorgan and the Orca Entities were, therefore, entitled to judgment as a matter of law under rule 166a(i).

### 3. With Prospective Contractual Relationships

Similarly, JPMorgan and the Orca Entities showed themselves entitled to judgment as a matter of law on the Owners' claim for tortious interference with prospective contractual relationships—probable "contracts with Petrohawk and/or purchasers of minerals produced" from the unleased portion of the tract. To avoid summary judgment on this claim, the Owners were required to produce more than a scintilla of evidence that (1) there was a reasonable probability that the Owners would have entered into a contractual relationship with a third party, (2) there was an intentional and independently tortious act by JPMorgan and the Orca Entities to prevent the relationship, (3) JPMorgan and the Orca Entities had a conscious desire to prevent the relationship from occurring or knew that interference was substantially certain to occur as a result of their actions, and (4) the Owners suffered actual harm or damage as a result of the interference. *See Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

26

As argued by JPMorgan and the Orca Entities in their summary-judgment motions, the Owners have no evidence that any act by JPMorgan or the Orca Entities was independently tortious. Conduct is considered independently tortious if it would be actionable under a recognized tort. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001). As we have discussed, the Owners failed to produce the required quantum of evidence on any of their other tort claims; thus, there is no evidence that JPMorgan's and Orca Assets' actions, alleged to have interfered with the Owners' prospective contractual relationships, were independently tortious. *See AMX Corp. v. Pilote Films*, No. 3:04-CV-2035-D, 2007 WL 1695120, at *20–21 (N.D. Tex. June 5, 2007); *McConnell v. Coventry Health Care Nat'l Network*, No. 05-13-01365-CV, 2015 WL 4572431, at *6–7 (Tex. App.—Dallas July 30, 2015, pet. denied) (mem. op.); *cf. AmeriPath, Inc. v. Hebert*, 447 S.W.3d 319, 342 (Tex. App.—Dallas 2014, pet. denied) ("Because we have already concluded Hebert's conduct raised a material fact issue on the issue of breach of fiduciary duty, appellants have similarly raised a fact issue as to Hebert's conduct being independently tortious."). The trial court did not err by granting JPMorgan's and the Orca Entities' no-evidence motions directed to this claim.

## III. CONCLUSION

JPMorgan, the Orca Entities, and the Owners each had a good-faith basis to assert title to the tract. Indeed, this court grappled with tracing the fractured title interests, the effect of the 1944 judgment on the 1929 deed, and JPMorgan's reasons

to assert title. *See Orca Assets*, 470 S.W.3d 158–67. Although this court ultimately concluded that the Owners' title was superior, JPMorgan's lease to Orca Assets during a time that it held a colorable legal claim to title is not rendered tortious based on hindsight. We conclude that the Owners proffered no, or less than a scintilla of, summary-judgment evidence regarding essential elements of each of their tort claims directed to JPMorgan's or the Orca Entities' actions regarding the tract. We accordingly overrule the Owners' first issue. We need not address the Owners' second and third issues because they assert the summary judgment was in error to the extent it was based on JPMorgan's and the Orca Entities' affirmative defenses or on their summary-judgment arguments attacking the Owners' lost-profits evidence. *See* Tex. R. App. P. 47.1. We affirm the trial court's summary-judgment order. *See* Tex. R App. P. 43.2(a).

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

DELIVERED: October 18, 2018